UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

SHARON PENELOPE
MONTERROSO ROMERO,

Plaintiff,

v. Case No: 6:24-cv-1749-JSS-RMN

JAMES RAY FRANKLIN,

Defendant.
_______________________________/

**ORDER**

Defendant moves for summary judgment. (Dkt. 59.) Plaintiff opposes the motion. (Dkt. 60.) Upon consideration, for the reasons outlined below, the court denies the motion.

**BACKGROUND**[1]

In October 2023, when Plaintiff was in her mid-twenties, she traveled from Guatemala to the United States to work as an au pair, a type of live-in childcare provider. (Dkt. 59-1 at 3–4.) In that role, she stayed with host families responsible for paying her a stipend. (*Id.* at 4; Dkt. 60-2 at 17.) Plaintiff participated in an au pair program regulated by the United States Department of State and managed by the organization Agent Au Pair. (Dkt. 59-1 at 5; Dkt. 60-2 at 19.) Plaintiff's authorization

[1] "The summary judgment record is viewed in the light most favorable" to Plaintiff as the non-moving party, and accordingly, "all reasonable inferences must be drawn" in Plaintiff's favor. *See Sylvester v. Fulton Cnty. Jail*, 94 F.4th 1324, 1329 (11th Cir. 2024).

to remain in the United States was tied to her participation in the program, meaning that a host family's decision to terminate her as an au pair could affect her immigration status. (Dkt. 59-1 at 26–27.) Agent Au Pair provided Plaintiff with training, which advised her to contact her coordinator if an issue involving a host family arose. (*Id.* at 5–6, 8, 10; Dkt. 60-2 at 19–20.)

Plaintiff's first host family lived in California. (Dkt. 59-1 at 5–6; Dkt. 60-2 at 16.) After approximately two months, the family decided to keep their children in school and daycare full-time and terminated Plaintiff because her services were no longer needed. (Dkt. 59-1 at 6.) Plaintiff then lived with her coordinator for two weeks while Agent Au Pair matched her with another host family, ultimately Defendant's family. (*Id.* at 8.) In December 2023, Plaintiff relocated to Florida to work for Defendant and his wife caring for their son and daughter. (*Id.* at 8, 15; Dkt. 60-2 at 15–16.) Defendant paid $6,043.75 to fly Plaintiff from California to Florida, (Dkt. 59-1 at 15; Dkt. 59-2 at 11; Dkt. 59-3 at 54; Dkt. 60-2 at 14–15), and planned to pay Plaintiff a stipend of $200.00 for forty to forty-five hours of work each week, (Dkt. 59-1 at 28; Dkt. 60-2 at 17). With respect to age, Defendant was in his late fifties, his wife was "only four years older than" Plaintiff, their daughter was three years old, and their son was one and a half years old. (Dkt. 59-1 at 26, 28.) Defendant was also recovering from back surgery. (*Id.* at 8.)

According to Plaintiff, although she expected to work only as an au pair for Defendant, Defendant expected her to engage in sexual activity with him, as well, and thus repeatedly made sexual advances toward her. (*Id.* at 28.) Defendant's sexual

harassment purportedly "forced [Plaintiff] many times to lock [herself] up in [her] bedroom" after her daily tasks were complete. (*Id.* at 16.) In general, Plaintiff "was afraid that [Defendant] would follow [her] everywhere," and consequently, she felt prohibited in her "ability to freely move around." (*Id.*)

The first incident of alleged sexual misconduct occurred on December 20, 2023. (*See id.* at 8.) The children's grandmother took the children for the day, and Defendant and his wife invited Plaintiff on a trip to see Christmas lights. (*Id.*) Around 5:00 P.M., Defendant's wife went to the car to get it started for the trip, so Plaintiff was briefly alone with Defendant. (*Id.*) Defendant told Plaintiff, "You look beautiful," and she thanked him. (*Id.* at 8–9.) Then, he opened the door for her. (*Id.* at 9.) When she proceeded through the door, he touched her three times, moving his hand from her upper back through her middle back to her lower back and buttocks. (*Id.*) Plaintiff did not comment on the touching at the time because she thought that it could have been accidental. (*Id.*) That said, the touching made her feel "very, very uncomfortable, especially because" Defendant did not apologize, as he presumably would have for an accident. (*Id.*) The next morning, Plaintiff reported the incident to her coordinator through the WhatsApp Messenger application. (Dkt. 60-2 at 22–23.) The coordinator told Plaintiff that she would "monitor the situation and document [Plaintiff's] concern." (*Id.* at 23.) Soon after Plaintiff reported the incident—on the same day—Defendant emailed the coordinator along with a support director working for Agent Au Pair, notifying them of Defendant's intention to terminate Plaintiff. (*Id.* at 18, 24–

25, 123.) The email provided two weeks' notice, (*id.* at 123), and indicated that Defendant did not want Plaintiff in the house because she "act[ed] scared of him," (*id.* at 25; *accord id.* at 18, 123). The email did not mention any touching between Defendant and Plaintiff. (*Id.* at 25, 123.)

On another occasion, Defendant allegedly touched Plaintiff in the family's laundry room. (Dkt. 59-1 at 9.) "[T]he laundry room [wa]s small, and the hallway inside the [room] [wa]s one meter." (*Id.*) Plaintiff was doing the laundry as part of her au pair work. (*Id.*) As she was leaving the room, Defendant was entering it. (*Id.*) When the parties passed each other, Defendant "put his hands on [Plaintiff's] abdomen." (*Id.*) Plaintiff walked quickly to her bedroom. (*Id.*) A similar incident occurred on December 26, 2023. (*Id.*) The house featured a narrow hallway with a coffee bar. (*Id.*) Plaintiff passed through the hallway en route to her bedroom. (*Id.*) Defendant passed through the hallway in the opposite direction and "put his hand on [her] abdomen" even though she "tried to avoid it" while remaining pleasant with him. (*Id.*) Plaintiff found it "very uncomfortable" that Defendant "did not respect [her] personal space." (*Id.*)

The final incident of alleged sexual misconduct occurred on December 28, 2023. (*Id.*) Plaintiff was at the house with Defendant and the children, Defendant's wife having left the house to go to her office. (*Id.*) Plaintiff played with the children in the playroom on the house's second floor. (*Id.*) Defendant was supposed to be working in the home office on the first floor, but he came to the playroom and asked Plaintiff

about her relationship history. (*Id.*) He asked her if she had a boyfriend in Guatemala or in the United States. (*Id.*) The question was "strange to [Plaintiff] because [Defendant] had already" posed it to her "at dinner before." (*Id.*) Plaintiff told Defendant that she had broken up with her boyfriend "[a] couple of months after [she] had come to the United States" because "the distance had not helped." (*Id.*) Defendant inquired into the ages of Plaintiff and her ex-boyfriend, and she informed Defendant that she was twenty-six and her ex-boyfriend was twenty-five. (*Id.*) Defendant stated: "Oh, [it is] very complicated having a long-distance relationship at that age, because one needs to be touched. You also need to be touched." (*Id.*) Plaintiff told Defendant that needing to be touched was not a problem for her in a relationship. (*Id.*) Although Plaintiff regarded the conversation as "a very inappropriate situation" in front of the children, although it "made [her] feel very uncomfortable," and although "[t]hat same day" she told Defendant that she did not care for physical contact, Defendant "insisted on the conversation." (*Id.*)

Defendant returned to the first floor, and Plaintiff stayed with the children. (*Id.*) Soon, however, the children wanted lunch, requiring Plaintiff to go to the kitchen on the first floor. (*Id.*) Plaintiff did not want to go to the kitchen alone, but in the week and a half that she had cared for the children, she had not established a sufficient rapport with them to convince them to accompany her to the kitchen when they did not want to go. (*Id.*) Accordingly, Plaintiff went to the kitchen by herself. (*Id.*)

Defendant proceeded to the kitchen and asked Plaintiff why she was there. (*Id.*) She informed him that she was preparing lunch for the children. (*Id.*) At that point, Defendant "was touching his penis on top of his pants." (*Id.*) He stated: "You know what I want." (*Id.*) Plaintiff stated that she did not. (*Id.*) Plaintiff could see that Defendant "already had an erection underneath [his] pants." (*Id.*) While "masturbating in front of" her, Defendant repeated: "You know what I want. Why did you come here?" (*Id.*) Plaintiff answered: "I came to this country to work, and [it is] the only thing that [I am] going to do. Do you understand?" (*Id.*) Still touching himself, Defendant indicated that he did not understand. (*Id.*)

Plaintiff returned upstairs, gave the children their food, and locked herself in a half bath in a nearby breakroom because she "felt very afraid." (*Id.* at 9–10.) Plaintiff's fear stemmed from multiple sources, including Defendant's "access to weapons" (such as the "classic weapons" that he displayed "on the wall"), his tall height relative to her, her unfamiliarity with the area surrounding the house, and the remoteness of that area. (*Id.* at 10.) On the last point, Defendant's "property [wa]s very large," "[t]he house was in the middle of an open space," and "no neighbors [were] nearby," so Plaintiff feared that "nobody would hear if something happened" to her. (*Id.*) In addition, Plaintiff "was afraid to call the police." (*Id.*) From the half bath, Plaintiff left messages for her coordinator and other support staff employed by Agent Au Pair, and the support director advised Plaintiff to lock herself in her bedroom on the first

floor. (*Id.*; Dkt. 60-2 at 33, 131, 134.) Agent Au Pair set up a Zoom call with Plaintiff to assist her. (Dkt. 60-2 at 33, 134.)

Given the layout of the house, to get to her bedroom, Plaintiff was required to go past the playroom. (Dkt. 59-1 at 10.) When Plaintiff left the half bath to go to her bedroom, Defendant was in the playroom. (*Id.*) He "started getting near" Plaintiff but was stopped by his son, who wanted him to read a story. (*Id.*) Plaintiff excused herself from the playroom, stating that she needed to use the bathroom, and then ran downstairs to her bedroom. (*Id.*) Plaintiff locked the bedroom door and started packing her belongings. (*Id.*) Defendant came to her door. (Dkt. 60-2 at 34, 134.)

Agent Au Pair decided that Plaintiff needed to be taken out of Defendant's house "immediately for her safety." (*Id.* at 36.) Plaintiff attempted to leave the house through the Uber rideshare service but could not acquire a ride. (Dkt. 59-1 at 10.) As a result, Agent Au Pair arranged for Defendant's wife to drive Plaintiff to a Dunkin' Donuts location. (*Id.*; Dkt. 60-2 at 34–35, 136.) Agent Au Pair also booked Plaintiff a room at a hotel in the vicinity and arranged for her to ride from the Dunkin' Donuts location to the hotel via Uber. (Dkt. 60-2 at 36, 133, 135, 137–41.) Defendant disputed Plaintiff's allegations of sexual misconduct, refused to pay her for her last week, and refused to pay a $1,400.00 housing fee. (Dkt. 59-1 at 22; Dkt. 60-2 at 40.) After she worked for Defendant, Plaintiff was placed with a different host family and did not endure further incidents of sexual misconduct. (Dkt. 60-2 at 36–37.) As of August 2025, Plaintiff was still working for the new family. (*Id.*)

Defendant allegedly caused Plaintiff lasting psychological harm, including "emotional distress, persistent anxiety, intrusive thoughts, nightmares, avoidance behaviors[,] and social impairment." (Dkt. 59-1 at 30; *accord id.* at 12, 16.) He reportedly made it difficult for Plaintiff to concentrate, regulate her emotions, trust other people, and develop relationships. (*Id.* at 30) A licensed clinical social worker diagnosed Plaintiff with post-traumatic stress disorder (PTSD) and depression resulting from Defendant's actions. (*See* Dkt. 60-7.)

In light of the above, Plaintiff sued Defendant for battery, negligent misrepresentation, negligence, false imprisonment, and a joint venture theory of liability under Florida common law, as well as violation of the Trafficking Victims Protection Reauthorization Act (TVPRA) under 18 U.S.C. § 1595(a). (Dkt. 1 at 33–48.) The court dismissed the negligent misrepresentation, negligence, and joint venture counts without prejudice for failure to state a claim. (Dkt. 58 at 2; *see* Dkt. 57.) In each of the remaining battery, false imprisonment, and TVPRA counts, Plaintiff seeks both compensatory and punitive damages. (Dkt. 1 at 33, 39, 48.) Defendant moves for summary judgment on the remaining counts. (*See* Dkt. 59.) Discovery in this case closed on March 2, 2026. (Dkt. 24 at 1.) A jury trial is set for the February 2027 term. (Dkt. 71.)

## APPLICABLE STANDARDS

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). Summary judgment is appropriate if the moving party "shows that

there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." *Id.* The party seeking summary judgment must "cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" to support its position that it is entitled to summary judgment. Fed. R. Civ. P. 56(c)(1)(A). "The court need consider only the cited materials" when resolving the motion. Fed. R. Civ. P. 56(c)(3); *see HRCC, Ltd. v. Hard Rock Cafe Int'l (USA), Inc.*, 703 F. App'x 814, 817 (11th Cir. 2017) ("This rule was implemented so that a court may decide a motion for summary judgment without undertaking an independent search of the record." (quotation omitted)).

A factual dispute is "genuine" only if "a reasonable jury could return a verdict for the non[-]moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if the fact could affect the outcome of the lawsuit under the governing law. *Id.* The moving party bears the initial burden of identifying those portions of the record showing a lack of a genuine factual dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004). If the moving party shows that no evidence supports the non-moving party's case, the burden then shifts to the non-moving party to show that there are, in fact, genuine factual disputes which preclude judgment as a matter of law. *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006).

To satisfy its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, the non-moving party must go beyond the pleadings and "identify affirmative evidence" that creates a genuine dispute of material fact. *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998); *see HRCC*, 703 F. App'x at 816–17 ("Presenting arguments in opposition to a motion for summary judgment is the responsibility of the non-moving party, not the court." (alteration adopted) (quoting *Blue Cross & Blue Shield of Ala. v. Weitz*, 913 F.2d 1544, 1550 (11th Cir. 1990))). In determining whether a genuine dispute of material fact exists, the court must view the evidence and draw all factual inferences in the light most favorable to the non-moving party and must resolve any reasonable doubts in that party's favor. *Skop v. City of Atlanta*, 485 F.3d 1130, 1136 (11th Cir. 2007). The court will not weigh the evidence or make findings of fact. *Morrison v. Amway Corp.*, 323 F.3d 920, 924 (11th Cir. 2003). Summary judgment should be granted only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non[-]moving party." *Matsushita*, 475 U.S. at 587.

When applying Florida substantive law, the court "is bound by the decisions of Florida's highest court, as well as the decisions of Florida's intermediate appellate courts 'unless there is persuasive evidence that the highest state court would rule otherwise.'" *Kinsale Ins. Co. v. Pride of St. Lucie Lodge 1189, Inc.*, 135 F.4th 961, 968 (11th Cir. 2025) (quoting *King v. Ord. of United Com. Travelers of Am.*, 333 U.S. 153, 158 (1948)). Such persuasive evidence does not include a federal court's disagreement with

an intermediate appellate court's decision. *See McMahan v. Toto*, 311 F.3d 1077, 1080 (11th Cir. 2002) ("The fact that we decided the issue differently is not a persuasive indication that the Florida Supreme Court would agree with us and not with one of its own intermediate appellate courts, which presumably knows more about Florida law than we do."); *Glass v. Captain Katanna's, Inc.*, 950 F. Supp. 2d 1235, 1238 n.3 (M.D. Fla. 2013) ("[A] federal court's disagreement with a state court decision is not a 'persuasive indication that the Florida Supreme Court' would decide the issue differently than a state intermediate appellate court." (quoting *McMahan*, 311 F.3d at 1080)).

**ANALYSIS**

The court considers Plaintiff's battery, false imprisonment, and TVPRA claims in turn. In addition to disputing these claims, Defendant devotes a section of his motion to Plaintiff's alleged damages, arguing only that specific requests for damages are contradicted by the record. (Dkt. 59 at 16–19.) The court denies the motion as to damages because "the consideration of issues pertaining to the calculation of damages is premature." *Levesque v. Gov't Emps. Ins. Co.*, No. 15-14005-CIV-MARRA, 2016 WL 11783335, at *5, 2016 U.S. Dist. LEXIS 205157, at *14–15 (S.D. Fla. Oct. 18, 2016) (deeming "issues pertaining to the calculation of damages . . . best addressed" at the trial or post-trial stage of the case). Further, the record supports that Defendant allegedly caused Plaintiff damages, for example lasting psychological harm including PTSD and depression. (*See, e.g.*, Dkt. 59-1 at 12, 16, 30; Dkt. 60-7.) Moreover, as Plaintiff asserts, (Dkt. 60 at 14–16), the law permits her to recover compensatory and

punitive damages for her battery, false imprisonment, and TVPRA claims. *See Jefferson Stores, Inc. v. Caudell*, 228 So. 2d 99, 99, 101 (Fla. Dist. Ct. App. 1969) (affirming an award of compensatory and punitive damages based on tort claims including battery and false imprisonment); *see also Arreguin v. Sanchez*, 398 F. Supp. 3d 1314, 1327–29 (S.D. Ga. 2019) (awarding compensatory and punitive damages for TVPRA violations).

**A. Battery**

Under Florida law, a tortious "battery consists of the infliction of a harmful or offensive contact upon another with the intent to cause such contact or the apprehension that such contact is imminent." *Paul v. Holbrook*, 696 So. 2d 1311, 1312 (Fla. Dist. Ct. App. 1997); *accord Chorak v. Naughton*, 409 So. 2d 35, 39 (Fla. Dist. Ct. App. 1981) ("To establish a battery, a plaintiff must suffer a harmful or offensive contact, and the tortfeasor must have intended to cause such contact."). The requisite intent "is not necessarily a hostile intent, or a desire to do harm." *Spivey v. Battaglia*, 258 So. 2d 815, 816–17 (Fla. 1972). "Rather, where a reasonable person would believe that a particular result was substantially certain to follow, intent will be legally implied . . . ." *Borneisen v. Cap. One Fin. Corp.*, No. 8:09-CV-02539-T-17TGW, 2011 WL 2730972, at *8, 2011 U.S. Dist. LEXIS 75712, at *20 (M.D. Fla. July 13, 2011) (citing *Spivey*, 258 So. 2d at 817), *aff'd*, 490 F. App'x 206 (11th Cir. 2012).

Defendant challenges Plaintiff's ability to prove his intent for the battery claim. (Dkt. 59 at 8–12.) Defendant also observes, with respect to the final incident of alleged

sexual misconduct, that according to Plaintiff, Defendant "touched . . . only himself." (*Id.* at 11.) "As a general rule, a party's state of mind (such as knowledge or intent) is a question of fact for the factfinder, to be determined after trial." *Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1476 (11th Cir. 1991); *accord Parker v. Bryce*, 96 So. 2d 154, 156 (Fla. 1957) ("The question of willfulness being fairly raised and being one of the vital issues in the suit, it should have been tried by a jury, or a trial by jury waived, by the [c]ourt, and not disposed of on a motion for summary judgment."); *Fleming v. Peoples First Fin. Sav. & Loan Ass'n*, 667 So. 2d 273, 274 (Fla. Dist. Ct. App. 1995) ("[G]enerally, fact issues relating to intent do not lend themselves to summary judgment[.]"). As to battery in particular, intent "is rarely subject to direct proof[] but must be established based on surrounding circumstances." *Paul*, 696 So. 2d at 1312 (citing *Bostic v. State*, 638 So. 2d 613, 614 (Fla. Dist. Ct. App. 1994)).

A reasonable jury viewing the record in Plaintiff's favor could conclude that Defendant subjected her to a harmful or offensive contact and intended to do so. Regardless of whether Defendant's purported masturbation in front of Plaintiff, by itself, amounts to battery, it supports Defendant's intent to batter Plaintiff during the other asserted incidents of misconduct, when he reportedly touched her back, buttocks, and abdomen without her consent. The alleged masturbation could indicate Defendant's sexual interest in Plaintiff. *Cf. United States v. Stahlman*, 934 F.3d 1199, 1228 (11th Cir. 2019) (focusing on the defendant's "testimony that he had masturbated to erotic stories about adults engaging in sex with children," and determining that the defendant's "interest in th[e] stories belie[d] his statement that he never had sexual

thoughts about children"). Other evidence suggesting Defendant's sexual interest in Plaintiff, such as his statement that she looked beautiful and his questions about her relationship history, could contribute to a finding of intent. *See Paul*, 696 So. 2d at 1311–12.

*Paul* is instructive. In that case, the plaintiff sued her former coworker for battery "claim[ing] that on two occasions, [he] came up behind her while she was working and tried to massage her shoulders." *Id.* at 1311. "On both occasions, [the plaintiff] immediately pulled away and told [him] to leave, which he did." *Id.* According to the plaintiff, he sometimes harassed her at work by asking her to "wear revealing clothing and suggesting that they engage in sexual relations." *Id.* The trial court determined that the contact "amounted to no more than a casual touching" and that the plaintiff "failed to produce evidence establishing intent." *Id.* at 1312 (quotation omitted). Consequently, it granted summary judgment on the battery claim against the former coworker. *Id.* The appellate court reversed, explaining that the offensiveness of "the act of approaching a co[]worker from behind while on the job and attempting to massage her shoulders" was "a question for the trier of fact to decide." *Id.* The appellate court further explained: "Based on the record . . . , a jury could reasonably infer that [the former coworker] intended to touch [the plaintiff] in a ma[nn]er that would constitute a battery. No evidence of an intention to cause harm is necessary." *Id.*

This case resembles *Paul*. A reasonable jury could conclude as follows. Defendant acted as Plaintiff's supervisor because he paid for her to travel to Florida,

took her on as an au pair in his house, planned to pay her a weekly stipend for her services, and had the authority to terminate her from her position. (Dkt. 59-1 at 8, 15, 28; Dkt. 59-2 at 11; Dkt. 59-3 at 54; Dkt. 60-2 at 14–18, 24–25, 123.) On one occasion, Defendant allegedly touched Plaintiff's back and buttocks, and on two occasions, he allegedly touched her abdomen. (Dkt. 59-1 at 8–9.) Plaintiff made clear to Defendant that she did not welcome the contact, for example by locking herself in her bedroom to avoid it and by emphasizing that she came to the United States to perform au pair work, not to engage in sexual activity with Defendant. (*See id.* at 9, 16; *see also* Dkt. 60-2 at 22–23.) Nonetheless, Defendant demonstrated his sexual interest in Plaintiff while she was working, as when he masturbated in front of her while she was making lunch for his children. (Dkt. 59-1 at 8–10, 28; Dkt. 60-2 at 34, 134.) Under *Paul*, it would be error to find that Defendant's contact with Plaintiff's back, buttocks, and abdomen "amounted to no more than . . . casual touching" or that Plaintiff "failed to produce evidence establishing intent." 696 So. 2d at 1312.

Additional grounds require denial of Defendant's motion as to battery. A reasonable jury could determine that Defendant acted intentionally when he touched Plaintiff's back and buttocks because he waited until he was alone with her to do so, made contact three times, did not apologize, and did not mention the touching in his email to Agent Au Pair the next day. The timing of the touching and the failure to mention it in the email or in an apology may indicate that Defendant intentionally concealed the touching, and this concealment may demonstrate Defendant's intent to commit battery. *Cf. United States v. Ware*, 69 F.4th 830, 843 n.10, 851–54 (11th Cir.

2023) (perceiving no abuse of discretion when a district court instructed a jury in a criminal case that intentional concealment by a person during the commission of a crime was an appropriate consideration for determining the person's guilt or innocence of the crime). The failure to apologize, alone, may be evidence of intent. *See Bennett v. Pipe Work Sols., LLC*, No. 1:17-cv-858-CLM, 2020 WL 1479154, at *8, 2020 U.S. Dist. LEXIS 52573, at *21–22 (N.D. Ala. Mar. 26, 2020) (denying summary judgment on a battery claim when evidence that the defendant did not apologize after contact was made supported that the contact was intentional). A reasonable jury could also find intent from Defendant's repeated contact with Plaintiff's back and buttocks. *See V.M. v. State*, 729 So. 2d 428, 430 (Fla. Dist. Ct. App. 1999) ("[T]he intent to strike the victim . . . is evidenced by [the defendant]'s repeated blows . . . ."). Similarly, a reasonable jury could conclude that Defendant's contact with Plaintiff's abdomen was intentional because it occurred twice under analogous circumstances—with Defendant passing Plaintiff in narrow hallways in his house. *See id.* Because the record supports intent and the other elements of battery under Florida law, Defendant is not entitled to summary judgment with respect to Plaintiff's battery claim.

**B. False Imprisonment**

Florida law defines the tort of false imprisonment as "the unlawful restraint of a person against h[er] will, the gist of which action is the unlawful detention of the plaintiff and deprivation of h[er] liberty." *Johnson v. Weiner*, 19 So. 2d 699, 700 (Fla. 1944). "The tort's purpose is to protect personal freedom of movement by curtailing detention without color of legal authority, which occurs when there is an improper

restraint that is not the result of a judicial proceeding." *Harder v. Edwards*, 174 So. 3d 524, 530 (Fla. Dist. Ct. App. 2015) (cleaned up). "In a false imprisonment action[,] the plaintiff is required only to 'establish imprisonment contrary to h[er] will and the unlawfulness of the detention.'" *Johnson v. Barnes & Noble Booksellers, Inc.*, 437 F.3d 1112, 1116 (11th Cir. 2006) (quoting *Rivers v. Dillards Dep't Store, Inc.*, 698 So. 2d 1328, 1331 (Fla. Dist. Ct. App. 1997)). "Once [the] plaintiff has established h[er] detention by one who has no authority to detain h[er], the defendant may challenge the claim of an unlawful detention by asserting the lawfulness of the detention as an affirmative defense." *Id.* (citing same). False imprisonment does not require the use of force, but absent the use of force, "there must be a reasonable apprehension of force." *Lewis v. Atl. Disc. Co.*, 99 So. 2d 241, 242 (Fla. Dist. Ct. App. 1957) (quotation omitted). Actions or words that threaten force may suffice to create the required apprehension. *See id.* The defendant need not restrain the plaintiff for an extended duration. *See Stockett v. Tolin*, 791 F. Supp. 1536, 1556 (S.D. Fla. 1992) ("[T]he act of pinning [the p]laintiff against the wall and refusing to allow her to escape, even though only done *for a short period of time*, was false imprisonment." (emphasis added)).

Defendant contends that he is entitled to summary judgment on Plaintiff's false imprisonment claim because his wife and he wanted Plaintiff out of their house and because Plaintiff continued to live in the house even after Plaintiff complained about Defendant to Agent Au Pair. (Dkt. 59 at 13.) In a single, unsupported sentence, Defendant also asserts that Plaintiff cannot "establish the required unlawfulness of her alleged detention." (*Id.*) These arguments are unpersuasive, as they lack explanation,

*see United States v. Holley*, 166 F.4th 139, 151 (11th Cir. 2026) ("requir[ing] an argument to be raised *and developed*"), and fail to consider the record in the light most favorable to Plaintiff, *see Skop*, 485 F.3d at 1136.

A reasonable jury could determine from the record that Defendant detained Plaintiff against her will through a reasonable apprehension of force, if not the use of force, and the detention was unlawful. *See Johnson*, 437 F.3d at 1116; *Lewis*, 99 So. 2d at 242. For the reasons explained above, a reasonable jury could hold Defendant liable for battery based on multiple occasions when he touched Plaintiff without her consent. Evidence supports that Plaintiff was required to lock herself in rooms in the house, such as the half bath upstairs and her bedroom downstairs, to avoid additional unwanted touching by Defendant and other instances of sexual misconduct by him. (Dkt. 59-1 at 9–10, 16.) For example, evidence supports that Defendant masturbated in front of Plaintiff and then followed her around the house when she evaded him, (*id.*), and that Agent Au Pair advised her to lock herself in her bedroom and to leave the house "immediately for her safety," (Dkt. 60-2 at 33–34, 36, 131, 134). In addition, Plaintiff testified that Defendant was taller than she was, that he kept weapons in the house, that the surrounding area was unfamiliar to her, and that the remoteness of the area made it difficult for her to leave. (Dkt. 59-1 at 10.) Under the circumstances, a reasonable jury could conclude that Defendant engaged in threatening conduct to detain Plaintiff against her will, making summary judgment on the false imprisonment claim improper. *See Lewis*, 99 So. 2d at 242–43 (reversing a directed verdict for the defendant corporation on a false imprisonment claim when testimony supported that

the corporation's agents detained the plaintiff in his car by approaching him and speaking to him "in a rough and threatening manner"); *United States v. Wiley*, No. 00-14057-CR, 2016 WL 7041979, at *5, 2016 U.S. Dist. LEXIS 166718, at *14 (S.D. Fla. Dec. 1, 2016) ("Because false imprisonment can occur for any length of time and without force, [the defendant's] threatening conduct of drawing his pocketknife was enough to illicitly restrain [the v]ictim to her living room and deprive her of her freedom of movement."), *aff'd*, 703 F. App'x 950 (11th Cir. 2017).

As to the unlawfulness of the detention, a reasonable jury could find that Defendant aimed to engage in sexual activity with Plaintiff despite her lack of interest and that Defendant had no authority to detain Plaintiff in furtherance of this aim. (*See* Dkt. 59-1 at 8–10, 16, 28; Dkt. 60-2 at 18, 22–25, 33–36, 123, 131–41.) *See Hennagan v. Dep't of Highway Safety & Motor Vehicles*, 467 So. 2d 748, 749–50 (Fla. Dist. Ct. App. 1985) (concluding that a civil complaint sufficiently pleaded false imprisonment by alleging that a state trooper "unlawfully detained and restrained [a grade school student] against her will" when he purportedly ordered her to enter his vehicle absent reasonable suspicion or probable cause, drove her "to an obscure location[,] and . . . sexually abuse[d] and molest[ed] her"). Although Defendant may "assert[] the lawfulness of the detention as an affirmative defense," *Johnson*, 437 F.3d at 1116, he puts forward no theory of lawful detention in his summary judgment motion, (*see* Dkt. 59). "If the movant bears the burden of proof on an issue, because, as a defendant, it is asserting an affirmative defense, it must establish that there is no genuine issue of material fact as to any element of that defense." *Int'l Stamp Art, Inc. v. U.S. Postal Serv.*,

456 F.3d 1270, 1274 (11th Cir. 2006). Defendant does not satisfy this standard. Accordingly, he is not entitled to summary judgment as to Plaintiff's false imprisonment claim.

**C. The TVPRA**

The TVPRA offers multiple avenues to civil liability. 18 U.S.C. § 1595(a). The statute authorizes "[a]n individual who is a victim of a violation of" 18 U.S.C. §§ 1581–1597 to "bring a civil action" to "recover damages and reasonable attorney[] fees." 18 U.S.C. § 1595(a). Violations of these sections include, among other prohibited acts, conduct relating to peonage, 18 U.S.C. § 1581, involuntary servitude, 18 U.S.C. § 1584, forced labor, 18 U.S.C. § 1589, trafficking with respect to these topics, 18 U.S.C. § 1590, and sex trafficking by force, fraud, and coercion, 18 U.S.C. § 1591. Attempts to commit this misconduct also amount to violations of the statute. 18 U.S.C. § 1594(a). Further, a TVPRA plaintiff is not limited to suing "the perpetrator" of a violation but may sue any person who "knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which th[e] person knew or should have known has engaged in an act in violation of" 18 U.S.C. §§ 1581–1597. 18 U.S.C. § 1595(a). The court does not explain each avenue of liability available to Plaintiff but focuses on a perpetrator theory of sex trafficking by force, fraud, or coercion. (*See* Dkt. 57 at 16–19 (the magistrate judge's explanation that the complaint states a TVPRA claim under this theory); *see also* Dkt. 60 at 11 (Plaintiff's assertion that Defendant intended to misuse the au pair program to traffic her from California to Florida "to economically

exploit and sexually abuse her").) Because at least one avenue of liability is available, Defendant is not entitled to summary judgment on Plaintiff's TVPRA claim.

As relevant here, a violation of section 1591 occurs when someone "knowingly[,] . . . in or affecting interstate . . . commerce, . . . recruits, entices, harbors, transports, provides, obtains, . . . maintains, patronizes, or solicits by any means a person" while "knowing, or . . . in reckless disregard of the fact, that means of force, threats of force, fraud, coercion . . . , or any combination of such means will be used to cause the person to engage in a commercial sex act." 18 U.S.C. § 1591(a). Violators of section 1591 need not know that their actions are in or affecting interstate commerce. *United States v. Baston*, 818 F.3d 651, 662 (11th Cir. 2016) ("[S]ex trafficking by force, fraud, or coercion does not 'require knowledge by a defendant that his actions are in or affecting interstate commerce[.]'" (alteration adopted) (quoting *United States v. Evans*, 476 F.3d 1176, 1180 n.2 (11th Cir. 2007))). "The phrase 'in commerce' refers to both the 'channels within which people and goods move through the flow of commerce' and the 'instrumentalities used to facilitate that movement.'" *United States v. Tovar*, 146 F.4th 1318, 1325 (11th Cir. 2025) (quoting *United States v. Ballinger*, 395 F.3d 1218, 1233 (11th Cir. 2005) (en banc)). "[T]he transportation of persons across state lines . . . has long been recognized as a form of 'commerce.'" *Camps Newfound/Owatonna v. Town of Harrison*, 520 U.S. 564, 573 (1997); *see United States v. Roberts*, 174 F. App'x 475, 478 (11th Cir. 2006) (explaining that the commerce element in section 1591(a) was satisfied when the defendant "attempted to meet and

to have commercial sex with two girls that he thought had been flown to Miami from Costa Rica, . . . crossing state lines and affecting interstate commerce").

Section 1591 defines "coercion" broadly, providing three definitions: (1) "threats of serious harm to or physical restraint against any person," (2) "any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person," and (3) "the abuse or threatened abuse of law or the legal process." 18 U.S.C. § 1591(e)(2). The term "serious harm" encompasses "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity . . . to avoid incurring that harm." 18 U.S.C. § 1591(e)(5). The term "abuse or threatened abuse of law or the legal process" is defined as the "use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, . . . to exert pressure on another person to cause that person to take some action or refrain from taking some action." 18 U.S.C. § 1591(e)(1).

The term "commercial sex act" refers to "any sex act, on account of which anything of value is given to or received by any person." 18 U.S.C. § 1591(e)(3). The statute does not further define "sex act." Applying the ordinary meaning of the term, courts have construed it to include masturbation. *See United States v. Taylor*, 44 F.4th 779, 788 (8th Cir. 2022) ("Congress's decision to use the modifier 'any' before the term

'sex act' indicates an intent to expand 'sex act' to include activities involving sexual gratification such as masturbation."); *United States v. Tollefson*, 367 F. Supp. 3d 865, 879 (E.D. Wis. 2019) ("[T]he ordinary meaning of sex act does not require physical contact; it includes masturbation."). "Because [s]ection 1591(a)(1) is written in the future tense, 'a commercial sex act need not occur for a [d]efendant to be liable'" under the statute. *Perez v. Sec. All., LLC*, No. 21-21713-CIV-LENARD/LOUIS, 2021 U.S. Dist. LEXIS 248262, at *22 (S.D. Fla. Dec. 30, 2021) (alteration adopted) (quoting *Ardolf v. Weber*, 332 F.R.D. 467, 476 (S.D.N.Y. 2019)) (collecting cases).

Viewing the record in Plaintiff's favor, a reasonable jury could find that Defendant violated section 1591 as to her. Evidence supports that Plaintiff crossed state lines flying from California to Florida to work as an au pair in Defendant's house and that Defendant covered the cost of the flight. (Dkt. 59-1 at 15; Dkt. 59-2 at 11; Dkt. 59-3 at 54; Dkt. 60-2 at 14–15.) From this evidence, a reasonable jury could conclude that Defendant's conduct was in or affecting interstate commerce. *See Camps Newfound/Owatonna*, 520 U.S. at 573; *Roberts*, 174 F. App'x at 478. The record also permits the conclusion that Defendant "knowingly . . . recruit[ed], . . . obtain[ed], . . . maintain[ed], . . . or solicit[ed] by any means" Plaintiff, *see* 18 U.S.C. § 1591(a), when he arranged for her to work as an au pair in his house. *See Datres v. Winfree*, No. 1:23-cv-519, 2025 WL 1442563, at *4, 2025 U.S. Dist. LEXIS 95670, at *11 (W.D. Mich. May 20, 2025) (indicating that "attract[ing a p]laintiff to come to" the location of an au pair position qualifies as recruiting her under section 1591(a)). A reasonable jury could find that Defendant

engaged in this conduct while knowing that he would use coercion in an effort to cause Plaintiff to participate in a commercial sex act. Coercion includes threats of serious harm to or physical restraint against Plaintiff, 18 U.S.C. § 1591(e)(2), and accordingly, the evidence supporting Defendant's liability for battery and false imprisonment also supports coercion. Further, the threat to evict an individual from a living arrangement may constitute a threat of serious harm to the individual and thus coercion for purposes of the TVPRA. *See Aneiros v. Viormar Trading Corp.*, No. 1:24-cv-20772-GAYLES/LOUIS, 2024 WL 4103921, at *3, 2024 U.S. Dist. LEXIS 160458, at *7 (S.D. Fla. Sept. 6, 2024) ("[The p]laintiff alleges sufficient facts to reasonably infer that he believed [that] he would suffer serious harm if he ceased working for [the d]efendants, namely that he would become homeless." (quotation omitted)).

Given the evidence of Defendant's sexual misconduct toward Plaintiff, including his masturbation in her presence against her will, (*see, e.g.*, Dkt. 59-1 at 9–10), a reasonable jury could conclude that Defendant used the au pair program to coerce Plaintiff into engaging in sexual activity with him in exchange for a place to stay and the authorization to remain in the United States. Such sexual activity meets the statutory definition of a commercial sex act, as "Congress's use of expansive language" in the definition—with "such terms as 'any sex act,' 'anything of value,' [and] 'given to or received by any person'—requires a liberal reading." *Noble v. Weinstein*, 335 F. Supp. 3d 504, 521 (S.D.N.Y. 2018); *see United States v. Cook*, 782 F.3d 983, 989 (8th Cir. 2015) (applying a broad definition of "anything of value" in the section 1591 context). To the extent that a sex act under section 1591(a) includes

masturbation, *see Taylor*, 44 F.4th at 788; *Tollefson*, 367 F. Supp. 3d at 879, the record supports that Defendant masturbated in Plaintiff's presence. (Dkt. 59-1 at 9–10.) In any event, the occurrence of a commercial sex act is not a requirement for civil liability under the TVPRA. *Perez*, 2021 U.S. Dist. LEXIS 248262, at *22. An attempt to commit sex trafficking by force, fraud, or coercion is itself a TVPRA violation capable of sustaining civil liability. 18 U.S.C. §§ 1594(a), 1595(a). The court notes that soon after Plaintiff reported the first alleged incident of unwanted touching to Agent Au Pair, Defendant emailed Agent Au Pair stating his intention to terminate Plaintiff's position in his house. (Dkt. 60-2 at 18, 22–25, 123.) The close temporal proximity between Plaintiff's report and Defendant's email—less than a day—would permit a reasonable factfinder to conclude that Defendant acted in retaliation, jeopardizing Plaintiff's immigration status because she rejected his advances. (*See* Dkt. 59-1 at 26–27.) *Cf. Jones v. Gulf Coast Health Care of Del., LLC*, 854 F.3d 1261, 1272 (11th Cir. 2017) ("'[A] period as much as one month between [a] protected expression and [an] adverse action is not too protracted' to establish causation [for a retaliation claim.]" (quoting *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004))). Ultimately, because Plaintiff can satisfy the requirements for civil liability under the TVPRA, Defendant is not entitled to summary judgment as to Plaintiff's TVPRA claim.

## CONCLUSION

Accordingly, Defendant's motion for summary judgment (Dkt. 59) is **DENIED**.

**ORDERED** in Orlando, Florida, on November 16, 2026.

JULIE S. SNEED
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record